Wachtler, J.
The defendant was charged with possession of weapons as a felony and reckless endangerment in the first degree. He moved to suppress the evidence against him on the ground that his constitutional rights had been violated. Following a hearing this motion was denied, the court finding that he had produced the weapon of his own volition. Shortly thereafter the defendant pleaded guilty to the crime of attempted possession of a weapon, a class E felony.
Expressed in its broadest terms the issue here is whether the defendant was subjected to an unreasonable search and seizure *109 in violation of his rights under the State and Federal Constitutions (N. Y. Const., art. I, § 12; U. S. Const., 4th Amdt.). However, this ease does not present the typical controversy involving the presence or absence of probable cause or exigent circumstances necessary to justify a warrantless search. Here we are concerned with the rarely considered question of whether or not the police may restrain a citizen ostensibly for investigation and if so, in what manner.
On the night in question the defendant was with a female companion. Between 2:00 a.m. and 2:30 a.m. they were first observed by a surveillance team of three plain-clothes police officers as the couple were visiting with a friend in Brooklyn. One of the policemen, Officer Jacaruso, testified that from a nearby rooftop he was able to see the defendant and his female companion through the kitchen window. They were smoking cigarettes which the officer testified he believed to be marijuana.
This vigil lasted until the defendant and his companion emerged from the building, entered the defendant’s automobile and drove away. The plainclothesmen, Jacaruso, Olson and Shields, followed in a private unmarked vehicle, a 1963 Chevrolet. The defendant drove directly to Queens where the plainclothesmen observed him park his car in front of a house which they later discovered was his residence. At this point, approximately 3:00 a.m., Officer Jacaruso testified that they decided to stop the defendant and ascertain his identity.
The officer’s testimony at the suppression hearing established that when the defendant pulled to the curb in front of his home, the unmarked car halted some 20 to 40 feet behind the defendant’s car and Officers Jacaruso and Shields exited. Pursuant to an impromptu plan, Officer Olson drove the private vehicle past the defendant’s car and blocked it from moving forward while Jacaruso and Shields walked in a nonchalant manner along the sidewalk toward the defendant. Then Olson emerged from his vehicle and moved toward the defendant who had by this time alighted from his own car. The defendant testified that he was holding his dog and had his keys in his hand when he saw three men in street clothes 'approaching him from different directions.
The version of the ensuing incident, found credible by the trial court, was that of Officer Jacaruso. He testified that before *110 any of the officers identified themselves, Oantor reached into his back pocket and removed what Jacaruso believed to be a silver pistol and pointed it at Jacaruso and Shields. Whereupon Jacaruso took his badge from his pocket, drew his service revolver and identified himself as a policeman. The defendant was told to freeze and place his hands over his head. After returning the pistol to his back pocket, the defendant complied with the order. Then the officers approached the defendant and removed the pistol from his back pocket. Jacaruso asked the defendant if he had a pistol permit and when he stated that he did not he was formally arrested and only then advised of his rights.
At the hearing Cantor denied ever drawing the pistol, asserting “ [I] did not sir, no. I didn’t have time, even if I wanted to. As soon as I got out of my car, they were just on top of me from three different angles — it is impossible, they were coming at me from three different directions, I had the dog with me and keys in my hand, it was impossible.”
After arresting him the police conducted a full search of the defendant’s person which turned up a quantity of barbiturates and marijuana. The officers then searched the defendant’s vehicle and found a pipe on the console which, they concluded, contained marijuana residue. The defendant’s female companion who was sitting in the defendant’s vehicle was also placed under arrest and a search of her pocketbook revealed a quantity of pills and marijuana.
The defendant contends that the action of the police constituted an unlawful seizure. The People counterargue that the stop and subsequent search of the defendant was reasonable under the circumstances. We agree with the defendant.
The threshold question is whether, on the facts of this case, there has been a search or a seizure. If there has been a search or a seizure, then its legality depends on the presence of probable cause or whether it fits within the narrow exception carved out by the Supreme Court in Terry v. Ohio (392 U. S. 1) and Adams v. Williams (407 U. S. 143) where forcible street encounters were found to have been properly initiated by the police and reasonable under the circumstances.
Here the People have disclaimed reliance on probable cause, so we must determine whether the conduct of the police in this *111 instance was reasonable. Whether or not a particular search or seizure is to be considered reasonable requires weighing the government’s interest in the detection and apprehension of criminals against the encroachment involved with respect to an individual’s right to privacy and personal security (Terry v. Ohio, supra; Camara v. Municipal Ct., 387 U. S. 523). In' conducting this inquiry we must consider whether or not the action of the police was justified at its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible. (Terry v. Ohio, supra, at p. 19; Cupp v. Murphy, 412 U. S. 291; People v. Kuhn, 33 N Y 2d 203.)
Applying these principles to this case, we note the trial court’s finding that the defendant produced the pistol of his own volition and that the seizure of the weapon occurred only after the arrest. Accordingly, we cannot and do not consider the propriety of the search, if indeed there was one. Bather we focus on the initial seizure of the defendant’s person noting, however, that if the initial stop of the defendant was unlawful the evidence thereafter acquired must be suppressed absent an independent establishment of probable cause. (See Chambers v. Maroney, 399 U. S. 42; Rios v. United States, 364 U. S. 253; Henry v. United States, 361 U. S. 98; People v. Loria, 10 N Y 2d 368.)
Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment (Terry v. Ohio, supra). This is true whether a person submits to the authority of the badge or whether he succumbs to force. Here the defendant was deprived of his freedom of movement when he was encircled by three police officers as he stood alongside his car which was blocked by the police vehicle.* At that moment he could not have proceeded on his way, therefore he *112 was seized. (See, e.g., United States v. Nicholas, 448 F. 2d 622; United States v. Strickler, 490 F. 2d 378.)
We place no significance on the fact that the defendant did not Imow he was ¡being accosted by the police thinking instead that he was about to be robbed. The crucial factor was that depriving the defendant of his freedom of movement was effected by the police. Constitutional protections do not vanish merely because the victim of the unlawful governmental action fails to perceive the identity of the violator as a police officer.
■ Other than to consider it a seizure, we have consciously eschewed the semantic trap of labeling the police action. The proscription against unreasonable searches and seizures is designed to prevent random, unjustified interference with private citizens whether it is denominated an arrest, investigatory detention, or field interrogation (Davis v. Mississippi, 394 U. S. 721; Cupp v. Murphy, 412 TJ. S. 291, supra; see, generally, La Fave, Arrest: The Decision to Take a Suspect into Custody; Reich, Police Questioning of Law Abiding Citizens, 75 Yale L. J. 1161). Street encounters between the patrolman and the average citizen bring into play the most subtle aspects of our constitutional guarantees. While the police should be accorded great latitude in dealing with those situations with which they are confronted it should not be at the expense of our most cherished and fundamental rights. To tolerate an abuse of the power to seize or arrest would be to abandon the law-abiding citizen to the police officer’s whim or caprice — and this we must not do. Whenever a street encounter amounts to a seizure it must pass constitutional muster.
In New York the authority to intercept persons on the street is derived from two sources, the stop-and-frisk law (CPL 140.50) and the common-law power to inquire. Although the former is more narrowly circumscribed than the latter, because it entails a greater intrusion on the privacy of the individual, neither may be exercised in derogation of the State and Federal Constitutions.
Before a person may be stopped in a public place a police officer must have reasonable suspicion that such person is committing, has committed, or is about to commit a crime (CPL 140.50). Reasonable suspicion is the quantum of knowledge *113 sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand. (Compare Schwartz, Stop and Frisk: A Case Study in Judicial Control of the Police, 58 J. Crim. L. C. & P. S. 433, 445 with La Fave, “ Street Encounters ” and the Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich. L. Rev. 40, 70.) To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice (Terry v. Ohio, 392 U. S. 1, supra; Wong Sun v. United States, 371 U. S. 471, 479). Nor will good faith on the part of the police be enough to validate an illegal interference with an individual (e.g., Terry v. Ohio, supra; Henry v. United States, 361 U. S. 98, supra; Hill v. California, 401 U. S. 797; Smith v. County of Nassau, 34 N Y 2d 18).
Here the record is barren of any objective evidence evincing criminal activity. Considering the long distance and less than credible observations made in Brooklyn, abandoned by the prosecution, and not adopted by the trial court as a justification for the police action, the officers did not observe the defendant participate in any criminal acts. Moreover, the police lacked independent knowledge or information from an informer, reliable or otherwise, to indicate that a crime had been committed (People v. Hunter, 30 N Y 2d 774) or that the defendant was engaged in criminal pursuits (cf. People v. Arthurs, 24 N Y 2d 688). Nor was the defendant’s behavior furtive or evasive (People v. White, 16 N Y 2d 270; see, generally, Search and Seizure: “ Furtive ” Movement or Gesture as Justifying Police Search, Ann., 45 ALR 3d 581; Commonwealth v. Jeffries, 454 Pa. 320) or dangerous to the safety of the police or others (Warden v. Hayden, 387 U. S. 294). Indeed, the events preceding the unlawful stop could not even be classified equivocal or suspicious (see People v. Corrado, 22 N Y 2d 308). Therefore, we conclude that the seizure under these facts was not predicated on specific, articulable facts and hence not justified under the Criminal Procedure Law.
Turning to the common-law authority of the police to make investigative inquiries, we note that this authority does not give the police a license to violate the Constitution (cf. People *114 v. Rivera, 14 N Y 2d 441, 448 [Fuld, Ch. J., dissenting]). The common-law power to inquire does not include the right to unlawfully seize. The minimum requirement for a lawful detention stop is a founded suspicion that criminal activity is afoot (e.g., United States v. Ward, 488 F. 2d 162; United States v. Bugarin-Casas, 484 F. 2d 853, cert. den. 414 U. S. 1136). Our court has consistently limited this power when it has been exercised solely on the basis of vague suspicion or as a means of harassment (see, e.g., People v. Stokes, 32 N Y 2d 202; People v. Schanbarger, 24 N Y 2d 288; Sibron v. New York, 392 U. S. 40). On the basis of the facts in the record we conclude that the investigative inquiry exceeded permissible bounds in its inception and scope. The police had no reason to question this defendant and there was no justification for surrounding him in a manner constituting a seizure.
Having concluded that the initial seizure of the defendant was unlawful, the fruits of that unconstitutional seizure must be suppressed. The pistol was revealed as a direct consequence of the illegal nature of the stop. Consequently, the conviction should be reversed and the accusatory instruments dismissed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Fuchsberg and Cooke concur.
Order reversed, etc.

 In People v. Butterly (25 N Y 2d 159) we remanded for a determination of whether the conduct of the detective in approaching the defendant’s stopped taxi and placing his police shield on the rear window constituted an arrest or routine surveillance. In a similar case the United States Supreme Court remanded for a determination of whether an arrest occurred when the police approached the defendant’s halted taxi from opposite sides, identified themselves and opened the cab door (Rios v. United States, 364 U. S. 253, supra).